IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| ERICA DUDLEY, | ) | CASE NO. 1:12-CV-00641 |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | MAGISTRATE JUDGE |
| | ) | KENNETH S. McHARGH |
| | ) | |
| COMMISSIONER OF SOCIAL SECURITY | ) | MEMORANDUM OPINION & ORDER |
| | ) | |
| Defendant. | ) | |

This case is before the undersigned pursuant to the consent of the parties. (Doc. 14). The issue before the Court is whether the final decision of the Commissioner of Social Security ("Defendant" or the "Commissioner") denying Plaintiff Erica Dudley's application for Supplemental Security Income benefits under Title XVI of the Social Security Act, 42 U.S.C. § 1381 *et seq.*, is supported by substantial evidence, and therefore, conclusive.

For the reasons set forth below, the undersigned AFFIRMS the decision of the Commissioner.

I. PROCEDURAL HISTORY

On August 19, 2008, Plaintiff Erica Garnett-Dudley (hereinafter "Dudley" or "Plaintiff") filed an application for Supplemental Security Income benefits. (Tr. 48). Plaintiff alleged she became disabled on July 4, 2008, due to chronic hypertension, high blood pressure, and heart attack. (Tr. 125). The Social Security Administration denied Plaintiff's application initially on January 5, 2009, and upon reconsideration on May 18, 2009. (Tr. 48-49). Thereafter, Plaintiff requested a hearing before an administrative law judge to contest the denial of her application. (Tr. 76). Her requested was granted and a hearing was scheduled. (Tr. 88).

1

On December 16, 2010, Administrative Law Judge Suzanne A. Littlefield (hereinafter the "ALJ") convened a hearing to evaluate Plaintiff's application. (Tr. 13). Plaintiff, along with her attorney, appeared and testified before the ALJ, as did Evelyn J. Sindolar, an impartial vocational expert. (*Id.*). On April 5, 2011, the ALJ rendered an unfavorable decision denying Plaintiff's application for benefits. (Tr. 63). Plaintiff now seeks review of the ALJ's decision, pursuant to 42 U.S.C. § 405(g).

## II. PERSONAL BACKGROUND & PERTINENT MEDICAL HISTORY[1]

Plaintiff was born on June 9, 1971, making her thirty-seven years old on her application date. (Tr. 120). She was thus considered a "younger person" for Social Security purposes. 20 C.F.R. § 404.1563(c). She speaks English, graduated from high school,[2] has no vocational or special job training, and has past experience working as a line assembler, produce clerk, cashier, baker, and cook. (Tr. 35, 42, 124, 126, 130, 137-143).

### A. Heart Disease and Assessments

On July 4, 2008, Plaintiff suffered a heart attack. Upon admittance to Bedford Medical Center, she was diagnosed with an acute inferior wall myocardial infarction, confirmed by an EKG. (Tr. 206). On July 5, 2008, Plaintiff underwent a cardiac catheterization, and a coronary angiography showed 70% proximal and 90% mid-vessel stenosis (both were subsequently stented), and normal left main, left anterior descending artery with moderate disease in the distal portion. (Tr. 225, 272). EKG revealed left ventricular ejection fraction of 60-65%, no pericardial effusion, normal right ventricular global systolic function, basal inferior and

---

[1] The following recital of Plaintiff's medical record is merely an overview of the medical evidence pertinent to Plaintiff's appeal. It is not intended to reflect all of the medical evidence of record.

[2] Plaintiff's initial Disability Report, dated August 19, 2008, indicated she completed 10th grade. However, at the hearing before the ALJ, Plaintiff expressed that she graduated from high school. (Tr. 35, 42, 130).

2

inferoseptal wall segments were hypokinetic, and normal mitral valve leaflets. (Tr. 476). Records indicate unremarkable recovery, and Plaintiff was released with no chest pain or other complaints, and told to follow-up with her primary care physician. (Tr. 225, 269).

Plaintiff followed up with her primary care physician, Dr. Diethra Cox, on July 16, 2008, who she began to see regularly for evaluation and treatment following her July 4, 2008 cardiac event. (Tr. 296). At her initial visit, Dr. Cox diagnosed Plaintiff with acute myocardial infarction, hypertension, and hyperlipidemia. (Tr. 296-297). Throughout treatment, Plaintiff initially complained of chest pain, which diminishes significantly over time—from July 30, 2008 onward, Plaintiff denied chest pain and regularly reports feeling "well"—and consistently denied palpitations, dyspnea, and fatigue. (Tr. 296, 298, 300, 378, 391). Treatment notes indicated good response and toleration of Plaintiff's medication regime. (296, 298, 300, 378, 391). Dr. Cox initially noted Plaintiff appeared mildly distressed and had anxiety, but no reference was made to Plaintiff's alleged anxiety after her initial visit in July 2008, although medication notes indicated she sometimes takes Zoloft, an anti-anxiety and anti-depressant medication. (Tr. 298-299, 300-301, 307-308, 335, 378-380, 391). On August 6, 2008, Dr. Cox recommended Plaintiff begin a low fat, low cholesterol diet in conjunction with a regular aerobic exercise regime. (Tr. 307-308).

Plaintiff began seeing Cardiologist Dr. Florian Rader on August 1, 2008. (Tr. 320-324). Plaintiff reported to Dr. Rader she has chest pains accompanied by dyspnea when "overexerting herself," and is prone to sweating at all times. (Tr. 320). Examination revealed poor control of her hypertension, and Plaintiff was referred to cardiac rehabilitation. (Tr. 323). On follow-up Dr. Rader noted Plaintiff's report of feeling well; however, she previously had severe chest pains upon exertion (playing basketball with her husband), but the pain subsided after taking

3

nitroglycerin, with no further pain. (Tr. 330). Plaintiff did not report anxiety or panic attacks to Dr. Rader, as indicated from his treatment notes, until November 7, 2008, where she stated anxiety-like symptoms with chest tightness while at rest. (Tr. 320-323, 330-333, 397). Notes indicate Plaintiff was scheduled to see a psychologist, and that she would try an SSRI. (Tr. 397, 401).

On October 7, 2008, Cardiologist Dr. Karen Kutoloski evaluated Plaintiff for cardiac rehabilitation. (Tr. 337-343). In Dr. Kutoloski's Review of Symptoms, she noted Plaintiff's chest pain, dyspnea, lower extremity edema, and exercise intolerance, but reported Plaintiff denied having chest pain and dyspnea with normal activities of daily living, including walking up hills or stairs. (Tr. 339-340). Additionally, the report indicated Plaintiff is able to drive and walk unassisted. (Tr. 340). Dr. Kutoloski's psychiatric evaluation findings were negative, finding no sleep disturbance, memory loss, disorientation, or inattention, with Plaintiff specifically denying anxiety or depression since her hospitalization in July 2008. (Tr. 340). Plaintiff was referred to an outpatient cardiac rehabilitation program, with instructions to exercise three times per week, with additional at-home exercise as the program progresses. (Tr. 341).

State agency physician Dr. Bruce Graham reviewed Plaintiff's records, and on December 31, 2008, prepared a physical residual functional capacity (RFC) assessment. (Tr. 365-373). In his assessment, Dr. Graham concluded Plaintiff is capable of: occasionally lifting or carrying twenty pounds; frequently lifting or carrying ten pounds; can stand, sit, and walk six hours in an eight-hour workday; and has unlimited ability to push and pull. (Tr. 366). Dr. Graham supports his RFC determination with medical evidence, including Plaintiff's echo from August 2008 and a

physical exam performed in October 2008, and noted she was progressing in an uncomplicated fashion. (Tr. 367-368).

Plaintiff returned to Dr. Rader in February 2009 with reports of chest pain, dizziness, and lower back pain. (Tr. 382). Dr. Rader noted Plaintiff's hypertension was poorly controlled, likely caused by medication non-compliance, which Plaintiff blamed on her not being able to afford her medication. (Tr. 382). On May 8, 2009, Plaintiff reported she was again able to purchase her medication, but her complaints of chest pain and dyspnea on exertion remained, as did poor control of her hypertension. (Tr. 425). A stress test was negative, and Plaintiff reported to Dr. Rader she was applying for social security, but he opined that "patient should not be disabled from her [coronary artery disease]" and refused to fill out paperwork at that time. (Tr. 428).

One month later, Plaintiff was evaluated by Dr. Nathan R. Beachy, who found her coronary artery disease to be "well-controlled" and continued her medication regimen. (Tr. 424). Although Dr. Beachy's report indicated depression, stress and problems falling asleep, Plaintiff reported she was "feeling good" and denied chest pain, dyspnea, and fatigue. (Tr. 420, 422).

After once again presenting at the hospital with chest pain in July 2009, Plaintiff underwent a left heart catheterization, a left valve angiography, and a coronary angiogram, which revealed: left heart ejection fraction of 60%; no mitral valve stenosis or regurgitation; no aortic valve stenosis or regurgitation; mild diffuse disease in Plaintiff's left main coronary artery, left anterior descending coronary artery, and circumflex coronary artery; normal left ventricular wall motion, but a severely hypokinetic mid-inferior wall; 60% stenosis in the proximal right coronary artery; and 80% stenosis in the mid-right coronary artery. (Tr. 467-468). Cardiac examination and two electrocardiograms at this time revealed normal sinus rhythm, with a

slightly prolonged QT interval. (Tr. 466). No more stents were recommended, and on follow-up Plaintiff was instructed by Dr. Beachy and Dr. Guruprasad to continue her medication, and maintain exercise and a healthy diet. (Tr. 417, 419, 460). By the end of July 2009, Plaintiff again denied chest pains, dyspnea, palpitations, and dizziness. (Tr. 460, 499).

At a follow-up with Dr. Beachy in September 2009, Plaintiff reported she told her cardiologist about nighttime chest pain, which that doctor believed was caused by panic attacks and were not cardiac-related. (Tr. 442). Nitroglycerin relieved Plaintiff's symptoms. (*Id.*). At this time, Plaintiff requested Dr. Beachy fill out a disability form, stating her cardiologist would not complete it based on her heart disease. (Tr. 442). A follow-up with Dr. Beachy in March 2010 showed "fair control" of Plaintiff's hypertension, relief from chest pain with nitroglycerin, and reports of anxiety and depression. (Tr. 432, 435). On October 11, 2010, Plaintiff reported she was "stressed out," and complained of headaches, and notes indicated a behavioral medicine service request for panic disorder and depressive disorder. (Tr. 481-482). By October 21, 2010, Dr. Beachy's notes indicated Plaintiff was feeling well with no cardiovascular disease symptoms. (Tr. 506).

B. <u>Mental Impairments and Assessments</u>

Plaintiff was evaluated by psychologist Hershel Pickholtz, Ed.D., at the request of the state agency, in November 2008. Plaintiff told Dr. Pickholtz she never received any psychiatric or psychological help, and she was unable to work due to heart difficulties and medication side effects. (Tr. 345-346). Dr. Pickholtz observed Plaintiff as exhibiting normal behavior, normal speech and thought patterns, and showed no signs of anxiety. (Tr. 346-347). Additionally, Plaintiff denied vegetative depression, crying spells, or mood swings, and her affective complaints only mildly impacted her daily activities. (Tr. 347). His report further indicated

6

Plaintiff made complaints of only mild anxiety, secondary to her physical difficulties, which related to an adjustment disorder. (Tr. 347). Plaintiff showed appropriate levels of insight and judgment, and reported she participates in activities of daily living involving physical, mental, and social abilities, including socializing with friends and family, attending religious services, performing housework, fishing, watching television and movies, and playing cards and video games. (Tr. 348).

In accordance with his assessment, Dr. Pickholtz found Plaintiff had only mild impairment in the following areas: overall abilities to understand and follow instructions based upon daily activities and overall presentation; overall abilities to maintain attention and perform simple repetitive tasks based upon overall pace and persistence; overall abilities to relate to others, including fellow workers and supervisors, based on her ability to relate to family, friends, and Dr. Pickholtz at her examination; and overall abilities to withstand stresses and pressures of day-to-day work activities, due to her mild depression and anxiety. (Tr. 349).

State agency psychologist Karen Terry, Ph.D. reviewed Plaintiff's record and on December 9, 2008, issued a report on Plaintiff's affective and anxiety-related disorders. (Tr. 351-364). Dr. Terry opined Plaintiff had only mild limitations on her activities of daily living, social functioning, and maintaining concentration, persistence, or pace. (Tr. 361). Further, Dr. Terry reported Plaintiff's records indicated no periods of decompensation. (*Id.*). Great weight was given to the opinion of Dr. Pickholtz, and Dr. Terry made an overall finding that Plaintiff did not have a severe psychological impairment. (Tr. 363). This finding was affirmed by state agency psychologist Todd Finnerty, Psy.D., on May 14, 2009. (Tr. 415).

Plaintiff did not begin specialized psychiatric treatment until September 11, 2009, when she consulted with Dr. Angela Gannon, a psychiatrist. On initial examination, Dr. Gannon

7

indicated Plaintiff did not exhibit acute distress, but did appear anxious on discussing her heart attack. (Tr. 450). Plaintiff reported discrete periods of intense fear that peak within ten minutes, and have accompanying physiological signs of intense anxiety. (Tr. 444). Plaintiff was diagnosed with panic disorder without agoraphobia, and prescribed medication. (Tr. 444-445, 451). On this initial consultation, treatment notes indicated Plaintiff complained of financial difficulties and family problems, and exhibited good judgment and insight, sustained attention and concentration, logical and organized thought processes, and cooperative and appropriate behavior. (Tr. 447-448, 450).

Plaintiff did not return to Dr. Gannon until December 2009. (Tr. 440). Dr. Gannon reported Plaintiff's complaints regarding her medical treatment, and concerns with paying for medical care. (Tr. 439). Treatment notes indicated Plaintiff presented a form from her attorney's office for Dr. Gannon to complete, stating her primary care physician was unwilling to complete it. (Tr. 439). Plaintiff stated her psychiatric medication was not working, that she continued to have anxiety and panic attacks, could not sleep, and was increasingly irritable. (Tr. 439). Dr. Gannon noted Plaintiff presented as anxious, agitated, and crying, with rambling thought process, impaired attention and concentration, was depressed, angry, and irritable, but had good judgment and insight. (Tr. 439-440).

At this time, Dr. Gannon completed a Medical Source Statement for Plaintiff, evaluating Plaintiff's capabilities to sustain basic mental activities of work. (Tr. 430-431). In her check-list assessment, Dr. Gannon reported she has not observed Plaintiff's abilities in the following areas: follow work rules; respond appropriately to changes in routine setting; maintain regular attendance and be punctual within customary tolerances; understand, remember and carry out complex, detailed, or simple job instructions; or management of funds/schedules. (Tr. 430-431).

Dr. Gannon further rated Plaintiff's abilities as "Poor to None" in the following areas: use judgment; maintain attention and concentration for extended periods, up to two hours; deal with the public; relate to co-workers; interact with supervisors; function independently without special supervision; work in coordination with or proximity to others without being unduly distracted or distracting; deal with work stresses; complete a normal workday without interruption from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods; socialize, behave in an emotionally stable manner; or relate predictably in social situations. (*Id.*). Plaintiff was reported to have "Unlimited/Very Good" abilities to leave home on her own, and to maintain her appearance. (Tr. 431). Dr. Gannon provided no supplemental medical or clinical findings to support her assessment. (Tr. 430-431).

Plaintiff reported to Rebecca Snider, R.N., on March 23, 2010 for mental health pharmacologic management. At this time, Plaintiff reported she missed her last appointment with Dr. Gannon and had not been taking her medication for a month, but wanted to go back on medication following a fight with her spouse. (Tr. 437). Treatment notes reported Plaintiff's complaints of chest pain triggered by anxiety, and sleeplessness. (*Id.*). Nurse Snider documented Plaintiff as showing agitated and anxious behavior, logical, organized, but racing thought processes, depressed mood, poor judgment and insight, and impaired attention and concentration. (Tr. 437). Additionally, Plaintiff reported auditory and visual hallucinations at this time. (*Id.*). However, no changes were made to Plaintiff's treatment plan, and at her final documented appointment with Dr. Gannon, Plaintiff again exhibited good judgment and insight with logical and organized thought processes, and Dr. Gannon reported no evidence of perceptual disturbances. (Tr. 438, 494). The record does not indicate any further psychiatric treatment for Plaintiff.

III.  ALJ's RULING

The ALJ made the following findings of fact and conclusions of law:

1. The claimant has not engaged in substantial gainful activity since August 19, 2008, the application date (20 C.F.R. § 416.971 *et seq.*).

2. The claimant has the following severe impairment:  status post-myocardial infarction (20 C.F.R. § 416.920(c)).

3. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. § 416.920(d), 416.925 and 416.926).

4. After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform a range of sedentary work as defined in 20 C.F.R. § 416.967(a).  She is capable of lifting 10 pounds occasionally, standing or walking 2 hours in an 8-hour day and sitting 6 hours in an 8-hour day with a sit/stand option.  She is capable of climbing ramps and stairs occasionally but precluded from climbing ladders, ropes or scaffolds.  She is capable of occasional balancing, stooping, kneeling, crouching, crawling and overhead reaching.  She must avoid concentrated exposure to extreme heat and cold, exposure to chemicals and exposure to hazardous machinery and unprotected heights.  She requires ready access to a bathroom and because of her heart condition, she requires a low stress job with no quotas or fast production rates.

5. The claimant is unable to perform any past relevant work (20 C.F.R. § 416.965).

6. The claimant was born on June 9, 1971 and was 37 years old, which is defined as a younger individual age 18-44, on the date the application was filed (20 C.F.R. § 416.963).

7. The claimant has a limited education and is able to communicate in English (20 C.F.R. § 416.964).

8. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 C.F.R. Part 404, Subpart P, Appendix 2).

9. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the

>
> national economy that the claimant can perform (20 C.F.R. § 416.969 and 416.969(a)).
>
> 10. The claimant has not been under disability, as defined in the Social Security Act, since August 19, 2008, the date the application was filed (20 C.F.R. § 416.920(g)).

(Tr. 55-63).

## IV. DISABILITY STANDARD

A claimant is entitled to receive Disability Insurance and/or Supplemental Security Income benefits only when he establishes disability within the meaning of the Social Security Act. *See* 42 U.S.C. §§ 423, 1381. A claimant is considered disabled when he cannot perform "substantial gainful employment by reason of any medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than twelve (12) months." *See* 20 C.F.R. §§ 404.1505, 416.905.

## V. STANDARD OF REVIEW

Judicial review of the Commissioner's benefits decision is limited to a determination of whether, based on the record as a whole, the Commissioner's decision is supported by substantial evidence, and whether, in making that decision, the Commissioner employed the proper legal standards. *See Cunningham v. Apfel*, 12 F. App'x 361, 362 (6th Cir. 2001); *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984)*; Richardson v. Perales*, 402 U.S. 389, 401 (1971). "Substantial evidence" has been defined as more than a scintilla of evidence but less than a preponderance of the evidence. *See Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524, 535 (6th Cir. 1981)*.* Thus, if the record evidence is of such a nature that a reasonable mind might accept it as adequate support for the Commissioner's final benefits determination, then that determination must be affirmed*. Id.* The Commissioner's determination must stand if supported by substantial evidence, regardless of whether this Court would resolve the issues of fact in

11

dispute differently or substantial evidence also supports the opposite conclusion. *See Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)*; Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983). This Court may not try the case *de novo*, resolve conflicts in the evidence, or decide questions of credibility. *See Garner*, 745 F.2d at 387. However, it may examine all the evidence in the record in making its decision, regardless of whether such evidence was cited in the Commissioner's final decision. *See Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989).

## VI. ANALYSIS

Plaintiff attacks the ALJ's decision on two fronts. First, Plaintiff contends the ALJ erred in her determination at Step Two that Plaintiff's anxiety and panic attacks do not amount to a severe impairment. Second, Plaintiff maintains her physical impairments meet or equal the Listing requirements at 4.04(C). Plaintiff's objections are not well taken.

### A. Plaintiff's Mental Impairments Found Not Severe

The ALJ properly evaluated the severity of Plaintiff's mental health impairments in her decision. At Step Two of the sequential evaluation process, a claimant must prove she has an impairment which significantly interferes with her ability to work. *See* 20 C.F.R. § 404.1520(c). While a claimant need not establish total disability at this stage, failure to demonstrate a severe impairment is critical because this step serves as a screening tool to allow adjudicators to dismiss groundless claims at an early stage in the evaluation process. *Higgs v. Bowen*, 880 F.2d 860, 863 (6th Cir. 1988). Given the importance of this step, courts have held that an impairment should only be deemed non-severe when the ailment is a "slight abnormality which has such a minimal effect on the individual that it would not be expected to interfere with an individual's ability to

work, irrespective of age, education and work experience." *Farris v. Sec'y of Health & Human Servs.*, 773 F.2d 85, 90 (6th Cir. 1985).

In the instant matter, Plaintiff argues the ALJ's determination that her mental health impairments do not amount to "severe" impairments was in error.  In her evaluation, the ALJ considered the four broad functional areas set out in the disability regulations for evaluating mental disorders in section 12.00(C) of the Listing of Impairments, or the "Paragraph B Criteria."  (Tr. 55).  20 C.F.R., Part 404, Subpart P, Appendix 1.  Assessing all the evidence on the record, including Plaintiff's mental health treatment records, treatment notes from other treating physicians, and the mental health analysis report by Dr. Pickholtz, the ALJ determined: (1) Plaintiff has only mild limitations in activities of daily living; (2) Plaintiff has only mild limitations in social functioning; (3) Plaintiff has only mild limitations in concentration, persistence, or pace; and (4) Plaintiff has experienced no episodes of decompensation.  (Tr. 55-56, 205-206, 286-289, 294-308, 312-313, 345-350, 378-412, 432-457, 481-495). These findings are supported by substantial evidence and Plaintiff's argument is not well taken.

Plaintiff argues that the evidence on the record shows her mental health impairments are more than *de minimus* and thus should have been categorized as "severe."  "An impairment can be considered as not severe, and the application rejected at the second stage of the sequential evaluation process, only if the impairment is a 'slight abnormality which has such a minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education and work experience.'"  *Farris*, 773 F.2d at 90 (quoting *Brady v. Heckler*, 724 F.2d 914, 920 (11th Cir. 1984)).  In support, Plaintiff points to medical records and the opinion of Dr. Gannon, Plaintiff's treating psychiatrist, and her associated nurse.

13

Plaintiff asserts the ALJ did not afford proper weight to the opinion of her treating psychiatrist, Dr. Gannon, in her evaluation of the severity of Plaintiff's mental impairments. It is well-recognized that an ALJ must give special attention to the findings of a claimant's treating sources. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004). This doctrine, often referred to as the "treating source rule," is a reflection of the Social Security Administration's awareness that physicians who have a long-standing treatment relationship with an individual are best equipped to provide a complete picture of the individual's health and treatment history. *Id.*; 20 C.F.R. § 404.1527(c)(2).[3] The treating source doctrine indicates that an opinion from such a physician is entitled to controlling weight if the opinion is (1) "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and (2) "not inconsistent with the other substantial evidence in the case record." *Wilson*, 378 F.3d at 544.

Even when a treating source's opinion is not entitled to controlling weight, the ALJ must still determine how much weight to give to the opinion by applying specific factors set forth in the governing regulations, including: (1) examining relationship; (2) length, nature, and extent of the treatment relationship; (3) supportability of the opinion; (4) consistency with the record as a whole; (5) specialization of the opining doctor; and (6) any other factors that support or contradict the opinion. 20 C.F.R. § 404.1527(c)(1)-(6). The regulations also require the ALJ to provide "good reasons" for the weight ultimately assigned to the treating source's opinion. *Id*. An ALJ's failure to adhere to this doctrine may necessitate remand. *Wilson*, 378 F.3d at 545.

The ALJ properly analyzes and sets out good reasons for discounting Dr. Gannon's Medical Source Statement, and minor misstatements of the medical evidence are inconsequential

---

[3]Effective March 26, 2012, sections 404.1527 and 416.927 of the Code of Federal Regulations were amended. Paragraph (d) of each section was redesignated as paragraph (c). *See* 77 F.R. 10651-01, 2011 WL 7404303.

to her overall evaluation.[4] (Tr. 56-57). The limitations provided in this check-list assessment are inconsistent with other evidence on the record, including evaluations from other mental health professionals, Plaintiff's other treating doctors, and even with Dr. Gannon's own treatment notes, which consistently indicated that, despite her anxiety, Plaintiff was stable with logical and organized thought processes, and generally showed good judgment and insight. (Tr. 430-431, 437, 493-494). Plaintiff's other treating doctors' notes only occasionally indicate anxiety and depression, for which Plaintiff intermittently was prescribed anti-anxiety medication, which is inconsistent with a finding of severe mental impairment. (Tr. 378-379, 382-384,391-393, 397-401, 435). The ALJ also specifically points to the opinion of Dr. Pickholtz, who concluded Plaintiff's anxiety was "mild" and "secondary to her physical difficulties," causing only mild impairment to her overall work-related mental abilities. (Tr. 56-57, 345-350). Additionally, Dr. Pickholtz's evaluation notes show Plaintiff described her affective complaints as having only a "mild" impact on her daily activities. (Tr. 56, 347-350). Beyond these inconsistencies, the ALJ points out that Plaintiff did not seek formal mental health treatment from Dr. Gannon until September 2009, only returned every three months for medication management, and the record is devoid of mental health treatment records after June 2010. (Tr. 56, 437, 493). The ALJ's rejection of Dr. Gannon's opinion regarding the severity of her mental health limitations is supported by substantial evidence.

Even assuming *arguendo* the ALJ's finding was not substantiated, such an error is harmless and does not warrant remand. When an ALJ erroneously fails to deem one of a

---

[4] The ALJ misstates that Dr. Gannon made no opinion on any work-related limitations and affirmatively states she has not observed the claimant in this capacity. However, Dr. Gannon does opine in her Medical Source Statement that Plaintiff has some work-related limitations in making occupational adjustments and making personal and social adjustments. However, because the ALJ's rejection of Dr. Gannon's opinion is supported by substantial evidence, this misstatement is harmless and has no effect on her overall decision. (Tr. 56, 430-431).

15

claimant's impairments as severe, such error is not necessarily harmful, and remand is not required if the ALJ found the claimant suffered from at least one severe impairment, and continues to assess the claimant's severe and non-severe impairments during the remaining steps in the evaluation process. *Maziarz v. Sec'y of Health & Human Servs.*, 837 F.2d 240, 244 (6th Cir. 1987). Accordingly, even if the ALJ erred in her evaluation of Plaintiff's mental impairment at Step Two, remand is not appropriate because, upon her finding that Plaintiff's post-myocardial infarction was severe, the analysis proceeded to the next step, and the ALJ considered both severe and non-severe impairments in determining Plaintiff's residual functional capacity. (Tr. 55, 57-58).

### B. Plaintiff's Impairments Do Not Meet the Requirements of Listing 4.04(C)

The third step of the disability evaluation process asks the ALJ to compare the claimant's impairments with an enumerated list of medical conditions found in the Listing of Impairments within 20 C.F.R. Part 404, Subpart P, Appendix 1. *See* 20 C.F.R. § 416.920(a)(4)(iii); *Turner v. Comm'r of Soc. Sec.*, 381 F. App'x 488, 491 (6th Cir. 2010). The Listing of Impairments recites a number of ailments which the Social Security Administration has deemed "severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience." 20 C.F.R. § 416.925(a). Each listing describes "the objective medical and other findings needed to satisfy the criteria of that listing." 20 C.F.R. § 416.925(c)(3).

A claimant will be deemed disabled if her impairment(s) meet or equal one of these listings. In order to "meet" a listing, the claimant must satisfy all of the listing's requirements. *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 653 (6th Cir. 2009). However, if the claimant does not meet all of the listing's requirements, she may still be deemed disabled if her impairments "medically equal" the listing. 20 C.F.R. § 416.926(b)(3). To do so, the claimant

16

must show that her impairments are "at least equal in severity and duration to the criteria of any listed impairment." 20 C.F.R § 416.926(a).

Plaintiff challenges the ALJ's determination that her heart condition does not meet Listing 4.04(C). This Listing, addressing ischemic heart disease, requires:

> Coronary artery disease, demonstrated by angiography (obtained independent of Social Security disability evaluation) or other appropriate medically acceptable imaging, and in the absence of a timely exercise tolerance test or a timely normal drug-induced stress test, an MC, preferably one experienced in the care of patients with cardiovascular disease, has concluded that performance of exercise tolerance testing would present a significant risk to the individual, with both 1 and 2:
>
> 1. Angiographic evidence showing:
>
>    a. 50 percent or more narrowing of a nonbypassed left main coronary artery; or
>    b. 70 percent or more narrowing of another nonbypassed coronary artery; or
>    c. 50 percent or more narrowing involving a long (greater than 1 cm) segment of a nonbypassed coronary artery; or
>    d. 50 percent or more narrowing of at least two nonbypassed coronary arteries; or
>    e. 70 percent or more narrowing of a bypass graft vessel; and
>
> 2. Resulting in very serious limitations in the ability to independently initiate, sustain, or complete activities of daily living.

20 C.F.R. Part 404, Subpart P, Appendix 1. In her evaluation, the ALJ found Plaintiff's heart ailment did not satisfy these Listing requirements because "her stents were placed in her right coronary artery, not her left as required by this Listing," and that "there is no evidence in the record that her impairment causes 'very serious' limitations in her ability to independently initiate, sustain or complete her activities of daily living." (Tr. 57-58, 421). Plaintiff rests her argument on (1) the ALJ's failure to explain why the medical finding of 70 percent left anterior descending artery stenosis does not meet or medically equal the requirements of the Listing, and

17

(2) the ALJ's failure to "more fully explain" why Plaintiff's cardiac impairment does not satisfy subsection (2).

Plaintiff's assignment of error is undermined by the evidence on the record, as well as the ALJ's rejection of Plaintiff's credibility[5] as to the intensity, persistence and limiting effects of Plaintiff's symptoms, to the extent they are inconsistent with the existing medical evidence. (Tr. 58-61). In support of her challenge to the ALJ's analysis at subsection (2), Plaintiff points to Plaintiff's "daily chest pain, frequent use of nitroglycerine, shortness of breath, and reported difficulty with selfcare and household chores." This evidence offers little support for Plaintiff's allegations of error. First, the ALJ found the medical evidence shows good control in general over Plaintiff's chest pains and hypertension, with sporadic episodes of chest pain and dyspnea upon exertion, but not upon walking. (Tr. 59-61). Second, Plaintiff consistently reported she was "feeling well" at medical examinations, and the ALJ noted that evidence suggests Plaintiff "progressively improved in an uncomplicated fashion." (*Id.*). Third, the ALJ points out that Plaintiff

> described daily activities not limited to the extent one would expect, given the complaints of disabling symptoms and limitations. She has no problems with her personal cares, she changes linens twice per week, she does laundry, grocery shops, sweeps, cooks a wide variety of foods, reads magazines and newspapers, can operate electronic appliances, can use the computer and knows how to use the internet and e-mail, goes fishing, socializes with friends and family on a regular

---

[5] This circuit follows a two-part test in evaluating a claimant's subjective allegations regarding disabling symptoms. 20 C.F.R. §§ 404.1529(c), 416.929(c); *Felisky v. Bowen,* 35 F.3d 1027, 1038-39 (6th Cir. 1994). First, the ALJ must determine whether there is objective medical evidence showing the existence of an underlying medically determinable impairment that could reasonably be expected to produce the claimant's symptoms. 20 C.F.R. §§ 404.1529(c), 416.929(c). Second, if the ALJ finds that an underlying impairment exists, then the ALJ must evaluate the intensity, persistence, and limiting effects of the symptoms on the claimant's ability to work. 20 C.F.R. §§ 404.1529(c), 416.929(c). In evaluating the claimant's symptoms, the ALJ should consider the individual's daily activities, the location, duration, frequency, and intensity of the symptoms, precipitating and aggravating factors, the type, dosage, effectiveness, and side effects of any medication taken to alleviate the symptoms, other treatment taken, and any other measures used to relieve the claimant's symptoms. 20 C.F.R. §§ 404.1529(c), 416.929(c); *Felisky,* 35 F.3d at 1039-40. The ALJ provides a full credibility analysis in her opinion, and Plaintiff does not challenge the ALJ's findings as to Plaintiff's credibility. (Tr. 58-61).

> basis[,] attends church, goes to the movies, plays cards and goes to the lake with friends.

(Tr. 61). This, along with Plaintiff's denial of chest pain or dyspnea with normal activities of daily living at her cardiac rehabilitation evaluation, undermines Plaintiff's argument that her heart disease results in "very serious limitations" required at subsection (2) under the Listing. (*Id.*). The ALJ's conclusion that Plaintiff has not met the requirements of subsection (2) is well supported.

Thus, Plaintiff's entire argument that she fulfills the requirements of the Listing has no basis. Plaintiff must meet *all* the requirements to be deemed disabled under the Listings. Even if there is merit to Plaintiff's claim that the ALJ erred by not finding Plaintiff's 70 percent stenosis satisfied subsection (1) under Listing 4.04(C), substantial evidence supports the ALJ's finding that Plaintiff's impairments do not result in very serious limitation of her ability to independently initiate, sustain, or complete activities of daily living, as required by subsection (2). (Tr. 57-61). As the Listing requires that a Plaintiff meet both prongs under Listing 4.04(C) to establish disability at this step, Plaintiff's assignment of error at Step Three is rejected.

## VII. DECISION

For the foregoing reasons, the Magistrate Judge finds that the decision of the Commissioner is supported by substantial evidence. Accordingly, the Court AFFIRMS the decision of the Commissioner.

IT IS SO ORDERED.

s/ Kenneth S. McHargh  
Kenneth S. McHargh  
United States Magistrate Judge

Date: May 22, 2013.